927 A.2d 53

Brandon MURDOCK

v.

STATE of Maryland.

No. 2198, Sept. Term, 2005.

Court of Special Appeals of Maryland.

July 2, 2007.

Caroline T. Nguyen (Jonathan E. Paikin, Wilmer, Cutler, Pickering on the brief), Washington, DC, for appellant.

Brian S. Kleinbord (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Argued before DAVIS, DEBORAH S. EYLER, and THEODORE G. BLOOM, (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

A jury in the Circuit Court for Baltimore City convicted Brandon Murdock, the appellant, of carjacking, robbery, conspiracy to commit armed carjacking, and conspiracy to commit robbery with a deadly weapon. He was sentenced to two 30–year prison terms, with all but 15 years suspended, for carjacking and conspiracy to commit armed carjacking, and a concurrent 15–year term for robbery. The remaining conviction was merged for sentencing purposes.

On appeal, the appellant poses three questions for review, which we have reordered and rephrased as:

I.   Did the trial court err in ruling that the State did not commit a Rule 4–263(a) discovery violation?

II.  Did the trial court err in allowing a police detective to testify that the appellant was a "target" of the investigation?

III. Did defense counsel render ineffective assistance of counsel by failing to impeach a State's witness with certain prior convictions?

For the reasons that follow, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

On September 13, 2004, shortly before 11 p.m., Paige Bailey and her boyfriend, Gary Cooper, were robbed and carjacked at gunpoint in the parking lot outside of Bailey's aunt's apartment building at 1200 Kitmore Road in Baltimore City.

Bailey had been staying with her aunt, Celeste Butler, for the previous month to care for her after recent knee replacement surgery. On the night in question, Bailey and Cooper both were at Butler's home. Around 10:30 p.m., Butler asked Bailey to run to the store to buy cigarettes.

Cooper used Butler's Ford Taurus to drive Bailey to a nearby convenience store. A few minutes later, they returned to the apartment complex. As Cooper drove into the parking lot, both he and Bailey noticed two men standing near the rental office. Bailey thought she recognized one of the men as a resident of the apartment complex.

Cooper pulled into a parking space in front of Butler's apartment. As he did so, he could see in the rearview mirror that the two men were approaching the car. He brought the car to a stop and began to exit. He urged Bailey, who was trying to find some change that she had dropped, to hurry up.

Cooper then heard someone say, "[H]ey yo." He turned and saw the same two men walking directly toward the back of the car. One man was carrying a gun and had his white T-shirt pulled up so that it covered his mouth and nose. He also had something, possibly the back of his T-shirt, covering the top of his head. The second man was unarmed and his face and head were uncovered. Cooper noticed that the unarmed man was walking with a limp.

The armed man approached Cooper as the unarmed man approached the passenger side of the car. When Bailey stepped out, the unarmed man was right in front of her, standing "eyeball to eyeball." By then, he also had pulled his T-shirt up over his mouth and nose.

The armed man ordered Cooper to put his hands up and asked him if he had any money. Cooper replied that he did

not. At the gunman's direction, Cooper emptied his pockets and relinquished the keys to the Taurus.

At the same time, the unarmed man grabbed Bailey's purse strap, forced her around the back of the car and over to the sidewalk, and stole her purse. At some point, Bailey threw her cell phone on the ground.

The armed man led Cooper to the same location. Both assailants were screaming at Cooper and Bailey to "get on the F-ing ground." Cooper and Bailey complied, lying facedown in the grass.

The two assailants then picked up Bailey's cell phone and drove away in the Taurus.

The police were called and responded to the scene. Bailey gave them the following description of the unarmed assailant: "light skinned, thin build, [5 foot 6 inches], 15–18 [years old], [brown] hair, white T-shirt (pulled up over mouth[) and] blue jeans shorts." She described the armed man as "d[a]rk skinned, med[ium] build, [5 foot 9 inches], 15–18 [years old], white tank top w[ith] white T-shirt around mouth [and] nose, gray sweat pants."

Cooper described the unarmed man similarly, except that he estimated the man's height as between 5 feet 4 inches and 5 feet 6 inches. He also added that the man had a "bush haircut" and "thick eyes."[1] Cooper's description of the armed assailant was identical to Bailey's.

Detective Richard Valenzia of the Baltimore City Police Department was assigned to lead the investigation. The morning after the carjacking, September 14, he interviewed both Bailey and Cooper. They advised him that they had no further information (other than that provided the night before), but that they both believed they could identify the perpetrators.

---

1. Based on Cooper's testimony, it seems likely he actually said "thick eyebrows."

Later that same day, Detective Valenzia received a phone call from an anonymous tipster advising him to "[l]ook at Brandon Murdock for that carjacking." The caller did not say anything else and promptly hung up. Detective Valenzia conducted a preliminary investigation and determined that the appellant was living in the same apartment complex as Butler and that he "fit the description[.]" [2]

The next day, September 15, 2004, Detective Valenzia met with Bailey and Cooper separately and showed each of them an identical photographic array of six men, including the appellant. Cooper immediately selected the appellant's picture. He signed the signature line above the appellant's photograph and wrote on the back of the sheet that the appellant was the "guy that helped in [the] carjacking. He grabbed [Bailey's] purse and cell phone."

Bailey also viewed the photographic array. She was able to narrow the identification of her assailant down to two photographs, including that of the appellant. She did not, however, sign on the signature line on the photographic array sheet to signify that she recognized any of the men.

On September 18, 2004, in the Circuit Court for Baltimore City, the appellant was charged with armed robbery, armed carjacking, and related offenses.[3] The appellant was arrested and taken into custody on September 28, 2004.

---

2. At the relevant time, the appellant was 5 feet 4 inches tall, weighed 130 pounds, and was almost 20 years old.

3. The appellant was charged with 10 counts relating to Bailey and 18 counts relating to Cooper: two counts each of robbery with a deadly weapon; robbery; assault in the 1st degree; assault in the 2nd degree; theft over $500; theft under $500; wearing, carrying, and transporting a handgun; use of a handgun in the commission of a crime of violence; conspiracy to rob with a deadly weapon; and conspiracy to rob. He also was charged with one count each of armed carjacking; carjacking; unauthorized use of a motor vehicle; theft of a motor vehicle; conspiracy to commit armed carjacking; conspiracy to carjack; conspiracy to obtain unauthorized use of a motor vehicle; conspiracy to steal a motor vehicle; and conspiracy to steal.

In December 2004, the Taurus was recovered by the police. No evidence was recovered from the vehicle linking the appellant to the crimes.

The case was tried to a jury from September 6 through September 9, 2005. The State called three witnesses—Detective Valenzia, Bailey, and Cooper—and introduced into evidence the photographic array signed by Cooper.

The appellant presented an alibi defense. He called two witnesses—his mother, Yvette Murdock, and his mother's housemate, Freda Johnson—both of whom testified that he was home at the time of the carjacking. He also testified on his own behalf to that effect.[4]

At the close of the State's case, defense counsel moved for judgment of acquittal on all counts. The motion was granted as to the two counts of theft of property with a value greater than $500 and denied as to all other counts. At the close of all the evidence, defense counsel's renewed motion for judgment of acquittal was denied.

On September 9, 2005, the jury returned a verdict convicting the appellant of carj acking, conspiracy to commit armed carj acking, robbery, and conspiracy to commit robbery with a deadly weapon. After sentencing, the appellant noted this timely appeal.

We shall include additional facts as necessary to our discussion.

## DISCUSSION

### I.

The appellant contends that the State violated its mandatory discovery obligations by not disclosing, pre-trial, that Bailey had positively identified him from a photographic array. He

---

**4.** The State also introduced into evidence on rebuttal a calendar page in order to prove that September 13, 2004, the date of the crime, was a Monday. The appellant's mother had testified that she believed it to be a Wednesday.

argues that the trial court erred in ruling that the State did not commit a discovery violation, and that the court's error was prejudicial. The State counters that the trial court correctly found that there was no discovery violation and that, even if a violation occurred, any error was harmless beyond a reasonable doubt.

### Facts Pertinent to the Discovery Violation Issue

On April 8, 2005, the State submitted its pretrial discovery materials to the defense. The materials disclosed that Cooper had positively identified the appellant from a photographic array. It included a copy of the array signed by Cooper and with his written narrative on the back of the form explaining his identification. The discovery also included notes from the police case file, including the following description of the presentation of the photographic arrays to each victim:

> Upon viewing array, Mr. Cooper positively identified [the appellant] as one of the individuals who committed the robbery. Upon interviewing Ms. Bailey, she advised that she did not get a good look at [her assailant] and was not sure if she could identify [him]. Upon viewing array, Ms. Bailey again advised that she was not sure and did not want to pick the wrong person.

The State later supplemented this discovery with the information that Bailey "did narrow it down to two photographs but she was unable to make a definitive identification."[5]

At trial, the State called Detective Valenzia to testify, *inter alia*, about the presentation of the photographic array to Bailey.

> [THE PROSECUTOR]: And what, if anything, was [Bailey's] response when she looked at the photographs?
>
> DETECTIVE VALENZIA: She, upon viewing the photographic array she had pointed to two suspects. She had pointed to the defendant and she had also pointed to

---

5. The supplemented discovery does not appear in the record, but the parties do not dispute that it was provided.

another subject, and she was unable to determine exactly who it was who had committed the robbery.

[THE PROSECUTOR]: Okay. So she was unable or unwilling to sign a photographic array indicating positively who she identified?

DETECTIVE VALENZIA: Correct.

Bailey was called as the State's next witness. In the course of describing how she came face-to-face with the unarmed assailant as she exited the Taurus, she made an in-court identification of the appellant:

BAILEY: So I opened the door and stepped out and when I stepped out I turned and he was standing there with the thing over, up to here, a white shirt. He had on a white T-shirt.

[THE PROSECUTOR]: Now, Ms. Bailey, I know that you just referred—*you pointed at the defendant. Are you telling the jury that you recognize him at this time?*

BAILEY: *Yes, yes, I do.*

(Emphasis added.)

When the prosecutor questioned her further about whether she had been able to identify the appellant from the photographic array, Bailey responded that she had "kind of narrowed it down to" two photographs "at the bottom," but that the photograph of the appellant "look[ed] a little darker" than she had remembered. However, she "knew it wasn't [the man in the second photograph] because he was too heavy."

During cross-examination of Bailey, when counsel for the parties were at the bench arguing an unrelated objection, the following ensued:

[DEFENSE COUNSEL]: While we're up at the bench.

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: I've been agonizing over a certain issue in this case and I would like to state it for your consideration if you don't mind me doing so now and very briefly. I filed a motion for discovery in this case and one of the questions was who made a photo I.D.

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: And the answer to that which I got back which is in your file was that there was one photo I.D.

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: And it's by this Gary Cooper.

THE COURT: Which you never got the array of the misidentification you're saying?

[DEFENSE COUNSEL]: Not only that, but it's really a misstatement because if a person, I think it's a misstatement if an individual is shown a photo array and identifies two people as the possible suspects, I think I'm entitled to know that.

After further discussion, it was established that (as we have explained) the State at first had given the defense only the copy of the photographic array signed by Cooper, but later supplemented its discovery with the information that Bailey had narrowed the assailant's identity down to two possible suspects in the photographic array. Thus, the defense had been informed, prior to trial, that Cooper had made a positive identification of the appellant from the photographic array and that Bailey had narrowed her assailant's identity down to two photographs in the same array (one of which was the appellant's photograph).

The court ruled as follows:

I don't think that the State has made any violation of their discovery. However, in light of the way this has sort of panned out and particularly in light of [Bailey's] new comment here today, which I believe is probably a surprise to [the prosecutor] as it was to [defense counsel] about her being able to identify [the appellant in court], I'm going to give you some latitude.

Defense counsel later cross-examined Bailey about the photographic array:

[DEFENSE COUNSEL]: . . . And you looked at six photos?

BAILEY: Yeah.

[DEFENSE COUNSEL]: All right. And what did—how many did you pick out?

BAILEY: Two.

[DEFENSE COUNSEL]: What did you say to the officer, if anything, when you selected two photographs?

BAILEY: I really don't remember. I think I said that the one on the left, the last photo was a little too heavy. That's about all.

[DEFENSE COUNSEL]: Well, did it come down to [it] could be this one, it could be this one, or I don't know who it is?

BAILEY: Because I said I went straight to the last two photographs and then I said well he's too heavy but the picture appeared dark so we just left it at that. That's all I remember of it.

* * *

[DEFENSE COUNSEL]: Well, did you identify anybody as the perpetrator?

BAILEY: As I said, all I said was he looks too heavy and that was all I said. I can't tell you anymore than that so those are the only two I looked at and went to. So that was the only person left but—

* * *

[DEFENSE COUNSEL]:So you were able to eliminate—

BAILEY: Exactly.

[DEFENSE COUNSEL]:—all the others?

BAILEY: Exactly.

[DEFENSE COUNSEL]: *But when it came to these two you said he looks like he's too heavy?*

BAILEY: *And that was it.*

[DEFENSE COUNSEL]: *And what about this one [referring to the appellant's photo], that's the guy?*

BAILEY: *That's what I said.*

[DEFENSE COUNSEL]: *You said that's the guy?*

BAILEY: I said he looks a little too dark but it may be the lighting from the picture. I said the picture looks too dark and that was all I said to them.

[DEFENSE COUNSEL]: *Well, I guess what we all want to know is were you identifying somebody in this photo array as one of the perpetrators?*

BAILEY: *Yes.*

[DEFENSE COUNSEL]: *That robbed you?*

BAILEY: *Yes, I was.*

[DEFENSE COUNSEL]: *You were?*

BAILEY: *Yes, I was.*

(Emphasis added.)

At that point, the trial judge interrupted and began questioning Bailey to try to clarify whether she actually had made an out-of-court identification of the appellant:

THE COURT: Okay. And so he [Detective Valenzia] started showing you these pictures, right?

BAILEY: Right.

THE COURT: And then at some point did you say no[,] no, no, or did you say uh-huh, uh-huh, uh-huh, or next one, next one, or did you just [] sit there quietly?

BAILEY: I don't recall. I believe I may have said next or no.

THE COURT: Okay. And at some point you said something different than you had said when you saw the previous pictures?

BAILEY: Yes.

THE COURT: And what was that that you said that was different?

BAILEY: I probably said no that's not him go to the next one.

THE COURT: Okay.

BAILEY: Go to the next one and then I said this may be him or something to that effect.

THE COURT: Okay. And then did he [] show [you] another picture after you said this may be him?

BAILEY: Yes, this is the pictures that were here [referring to the State's exhibit] and we went through each one of them like that.

THE COURT: Okay. You're mixing my question. A moment ago you said you went no, no, no, and then you changed the no no to say this may be him.

BAILEY: When I got to this picture [referring to the picture of the appellant].

* * *

THE COURT: And then did he continue to show you another picture or did he stop?

BAILEY: I believe he showed me the next picture.

THE COURT: And what did you say when you saw that picture?

BAILEY: I said I'm not sure but he looks too fat.

THE COURT: Did the officer—did the officer ask you to do anything after you said what you just told me?

BAILEY: I don't believe so, Your Honor.

THE COURT: Did he ask you to write anything?

BAILEY: No, he didn't.

THE COURT: Did he ask you to sign anything?

BAILEY: No, he didn't.

THE COURT: *Were you making a positive identification or were you not sure who it was?*

BAILEY: *I believe I was making a positive identification, but like I said it looked dark. The picture looked dark but the features looked the same.*

THE COURT: Very well. And that's why you answered [defense counsel's] question the way you did.

BAILEY: Yes, Your Honor.

(Emphasis added.)

Defense counsel resumed cross-examination, trying to elicit a clear answer from Bailey as to whether she had positively identified the appellant from the photographic array. When asked again what she told Officer Valenzia when she saw the appellant's picture, she replied: "I was pretty sure but I don't know if I said pretty sure or I believe so or yes. I know it wasn't yes, but I was like I believe so or maybe. I don't remember exactly what he asked or what my response was...."

On re-direct, the prosecutor questioned Bailey further concerning the photographic array:

[THE PROSECUTOR]: Ms. Bailey, I show you again the photograph[s] that we are talking about. When you were shown this photographic array did you sign your name to any photograph? *Were you willing and able to say for one hundred percent sure that the photograph at the ... bottom middle was the person that carjacked you?*

BAILEY: *I believe so.*

[THE PROSECUTOR]: You were willing to sign and say that it was one of those two?

BAILEY: Yes.

[THE PROSECUTOR]: But the fact is you only narrowed it down [to] two, right?

BAILEY: Exactly.

[THE PROSECUTOR]: Now, sitting in the courtroom today do you have any doubt at all on a scale of zero to one hundred percent that that person sitting right there is the person that carjacked you and your [] fiancee?

\* \* \*

BAILEY: I have no doubt at all.

(Emphasis added.)

After a brief re-cross examination, the trial judge asked counsel whether Bailey could be excused. Defense counsel asked to approach the bench and made two motions:

[DEFENSE COUNSEL]: Your Honor, I get back to the original point here and I think at this time I'm going to move that the jury be instructed to disregard [Bailey's] testimony. The reason I say it, the State is under an obligation to supply counsel with any information regarding a photographic identification. This lady, and I acknowledge that her testimony is not crystal clear in all respects but this—the essence of it is that she made a positive identification. She saw a picture. She was satisfied in her own mind that that was the person. She was prepared to sign the picture and say it was the person. That's a photographic identification.

Now if the police officer neglects to have her sign her name on this sheet, well, that's a deficiency on his part, but it doesn't mean that there wasn't a photographic identification and it doesn't mean that we're not entitled to be notified of that in advance so that we could perhaps have her interviewed on her own or whatever.

You know we come into this courtroom assuming that she made no I.D. and then we come to find out that she did make an I.D.

[THE PROSECUTOR]: If I may briefly—

[DEFENSE COUNSEL]: In fact, it's not a case of narrowing it down to two. She looked at one and said well it couldn't be him because he's too heavy. This is the guy. That's a positive identification. We're never notified.

I think that the discovery rules entitle us to that information[. A] nd what is the remedy[?] I think it's A, a mistrial or, B, that the jury be instructed to disregard her testimony. *So I think I'll revise my motion and I'd say I move A for a mistrial and if Your Honor fails to agree with me on that, then as an alternative that they be instructed to disregard her testimony.*

THE COURT: The State wish to be heard?

[THE PROSECUTOR]: Yes, Your Honor. I spoke to Ms. Bailey at least twelve times before today. Every single time she indicated to me that she was not able to make an

identification. That she was unwilling to sign her name. I think she's trying to bolster her testimony at this point, but there was never, not once did she say she would have been willing to sign her name.

She said she always thought it was one of the two. She never was [] sure which. I think in part feeling intimidated or nervous she was trying to make it sound better than it was, but my conversations with the detective and with her at all times she indicated she was only able to narrow it down. . . .

(Emphasis added.)

The trial judge denied both motions, opining:

Well, let me just say something. You know it would really be nice if when a witness got on the witness stand that we knew what they were going to say. . . . But in reality witnesses are lay people. Sometimes they get on the stand and they renege, they go south. They don't say what they said originally. Sometimes they get on the stand and they have a sudden epiphany and they remember things that they didn't remember up to that point, and sometimes they're just plain old confused. I don't know what Ms. Bailey's issue is today. . . .

. . . [B]ut [] it doesn't give rise to a mistrial, but it certainly gives rise to a wonderful closing argument. . . .

There is more than sufficient evidence and a manner to handle this witness and the way in which this testimony went. . . .

* * *

Now whether the jury believes her testimony today, that certainly is going to be up to them to decide, but I'm not going to grant a mistrial because the witness didn't go the way we thought the witness should. I don't believe that [the prosecutor] has sandbagged the Court or the defense, because had she had a hundred percent positive identification you best believe she would have used it. . . . I think [the

prosecutor] was very surprised at what the witness said. I mean she appeared to be very shocked.

Defense counsel moved to be allowed to introduce evidence that Bailey previously had informed the prosecutor that she could not make a positive identification. The court declined to allow such evidence because it was "trial prep," but offered to instruct the jurors that they should "examine the testimony of any eyewitness with great care" and to make specific reference to Bailey in the instruction. Defense counsel then asked if he could question Bailey about her prior conversations with the prosecutor; the court granted his request. The prosecutor offered to give her notes from her conversations with Bailey to defense counsel for him to use for this purpose. Defense counsel declined the offer, stating that he was satisfied with the prosecutor's account of what had occurred.

After a lunch recess, Bailey was recalled to the stand and defense counsel questioned her about her pretrial conversations with the prosecutor:

[DEFENSE COUNSEL]: Were you aware during any conversation that you had with [the prosecutor] that she was taking notes of your conversation, writing things down?

BAILEY: No, I' m not sure. She may have mentioned it. I'm not sure.

[DEFENSE COUNSEL]: Well, would it surprise you to know that her notes reflect that in these prior meetings that you had with her or discussions that you had with her you were never able to make a positive identification of anyone? Would that surprise you?

BAILEY: I guess maybe it would.... Yes, it may surprise me.

Bailey then was excused as a witness.

At the close of all the evidence, the court instructed the jury in relevant part:

You should also consider the witness' certainty or lack of certainty, the accuracy of the witness' statements or any prior description or the witness' credibility or lack of credi-

bility as to any prior description, as well as any other factor surrounding the identification.

*In fact, in this case you have heard that prior to the trial Ms. Bailey did not identify the defendant and then there was testimony that there was an identification.* It is for you to determine the reliability of any identification and for you to give it the weight you believe it deserves.

(Emphasis added.)

In closing, the prosecutor pointed out that Cooper had identified the appellant in open court and from the photographic array; that Bailey had identified the appellant in open court; and that, although at the time Bailey was shown the array, she only could narrow her selection to two photographs, as she testified at trial and viewed the array as an exhibit, she grew increasingly confident that "the person in the bottom middle picture"—*i.e.*, the appellant—was her assailant.

Defense counsel argued in closing that Bailey had lied on the stand when she claimed to have positively identified the appellant from the photographic array.

In rebuttal closing, the prosecutor, referring to the in-court identifications of the appellant by Cooper and Bailey, stated, "What we've got are two one hundred percent positive identifications of [the appellant], one hundred percent certainty from two people and based on that I ask you to find him guilty."

### Rule 4–263 and Williams v. State

Rule 4–263 governs discovery in criminal cases. It classifies such discovery in three categories: 1) discovery the defendant is entitled to without request, 2) discovery the defendant is entitled to upon request, and 3) material not subject to discovery. The first category, governed by subsection (a) of the rule, requires disclosure of any pretrial identification of a defendant:

**Disclosure without request.** Without the necessity of a request, the State's Attorney shall furnish to the defendant:

\* \* \*

(2) Any relevant material or information regarding ... (C) pretrial identification of the defendant by a witness for the State.

Md. Rule 4–263(a).

Subsection (g) of Rule 4–263 further defines the scope of the State's discovery obligation:

> The obligations of the State's Attorney under this Rule extend to material and information in the possession or control of the State's Attorney and staff members and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney.

In *Williams v. State,* 364 Md. 160, 771 A.2d 1082 (2001), the Court of Appeals had occasion to construe Rule 4–263 in the context of a surprise in-court identification of the defendant by a State's witness. The defendant was convicted of distribution of cocaine. That charge and others were brought against him in connection with a raid of an apartment by narcotics officers, pursuant to a search warrant. Trooper Wilson was one of the officers surveilling the apartment in the hours leading up to and immediately prior to the raid.

A large quantity of cocaine was seized from the apartment when the warrant was executed; three men found in the apartment were arrested and charged with narcotics violations. The defendant, who was not found in the apartment, was charged upon allegations that he had entered the apartment 30 minutes before the search warrant was executed and had delivered cocaine to the three residents; and that he had left the apartment before the raid occurred.

Prior to trial, defense counsel made numerous discovery requests that asked, in one form or another, whether Trooper Wilson could identify the defendant as the man seen entering

the premises where the drugs were seized.[6] Again and again, the State responded that Trooper Wilson could not. Defense counsel also filed a motion to suppress extrajudicial identifications and, in an attached cover letter, offered to withdraw the motion as moot upon confirmation that Trooper Wilson could not identify the defendant.

Before the hearing on the motion to suppress, the prosecutor verbally confirmed that no identification had occurred, stating that Trooper Wilson could only give a "general description of a man who entered the surveilled premises." *Id.* at 166, 771 A.2d 1082. Defense counsel agreed that such a general description is not a "pretrial identification" under Rule 4–263. The State also proffered to the court that Trooper Wilson would testify as to "the stature, the size, the height and definitely that it was an African American individual ..." *Id.* at 167, 771 A.2d 1082.

At the defendant's bench trial, Trooper Wilson testified that the man he saw entering the apartment 30 minutes before the raid was "Mr. Williams who is seated at the defense table." *Id.* at 168, 771 A.2d 1082. On cross-examination, the trooper testified that he had told the prosecutor, four months before trial, that he recognized the defendant as that man.

Defense counsel moved to strike Trooper Wilson's in-court identification, renewed a motion to dismiss, and moved the court motions, stating:

> The ... out of court identification of ... Trooper Wilson was a surprise to the State's Attorney and you feel that ... under Rule 4–263 he should have informed you. And I agree with you on that. But, if it was a surprise to him, he couldn't inform you of something he didn't know about. It was a surprise to you and to him. And I don't think that he deliberately withheld it back. I asked him point blank

---

**6.** As noted above, information about a pretrial identification of the defendant must be disclosed by the State without request, under Rule 4–263(a).

again was it a surprise, and he indicated it was. So I don't think that all of this taken together warrants a new trial. *Id.*

Aside from Trooper Wilson's testimony, the State's case consisted of accomplice testimony, from one of the residents arrested in the raid, that the defendant had delivered cocaine to the premises for distribution.

On appeal after conviction, the defendant argued that the State had violated its discovery obligations under Rule 4–263 and that he had been prejudiced as a result. This Court affirmed the conviction in an unreported opinion. The Court of Appeals granted *certiorari* and reversed.

The Court noted that discovery rules must be interpreted "in light of [their] underlying policies[.]" *Id.* at 172, 771 A.2d 1082. It observed that the "major objectives" of Rule 4–263(a) are "to assist defendants in preparing their defense and to protect them from unfair surprise." *Id.*

In light of these underlying policies, the Court considered the impact of a surprise in-court identification upon a defendant, stating:

> One can hardly imagine a greater obstacle to an accused's defense than the State's declaration prior to trial that the only corroborating witness could not specifically identify the defendant, while the testimony of the witness at trial was nothing shy of a clear and positive identification.... Identification testimony may be outcome determinative and hence, any solid preparation of a defense demands this information. Furthermore, unlike statements made by the defendant ... identification testimony naturally comes from third parties. As such, it is information with which, absent the State's disclosure, a defendant may never be familiar until trial. To prevent unfair surprise, disclosure of identification testimony is required.

*Id.* at 174, 771 A.2d 1082.

The Court rejected the State's argument that, because it had told defense counsel that Trooper Wilson could generally

describe the defendant, there was no discovery violation. It noted:

> Disclosure, in and of itself, would be immaterial if it is not accompanied by the necessary and intrinsic quality of accuracy.

> \* \* \*

> Substantial inaccuracy with respect to whether a State's witness can identify the accused is particularly disconcerting because, depending on the precision of the identification, the outcome of the trial may often be affected. . . .

*Id.* at 175, 771 A.2d 1082.

The Court accepted the trial court's factual finding that the non-disclosure was "inadvertent" but emphasized that malfeasance by the State is not necessary for it to have committed a discovery violation: " '[S]urprise' does not excuse or mitigate the prejudice to the defendant." *Id.* at 176, 771 A.2d 1082 (footnote omitted). This is so, the Court reasoned, because Rule 4–263(g) holds the State's Attorney's Office accountable for "material and information" in the possession or control of those persons involved in the investigation and who report to the State's Attorney's Office. The responsibility exists regardless of whether individuals in the State's Attorney's Office have actual knowledge of the information.[7] Otherwise, the State could avoid learning discoverable information from police and operate beyond the scope of the discovery rules. Accordingly, knowledge of information in Trooper Wilson's control was imputed to the State and the failure to disclose this information to the defendant was held to be a violation of its discovery obligation under Rule 4–263(a).

Having concluded that the State violated Rule 4–263(a) and that the trial court erred by finding no such violation, the

---

7. As we have noted, Trooper Wilson testified that he had informed the prosecutor before trial that he could identify the defendant. The prosecutor claimed, however, to have been surprised by Trooper Wilson's in-court identification of the defendant, and the trial judge found as a fact that he was surprised.

Court went on to conclude that the discovery violation was prejudicial to the defendant because Trooper Wilson's eyewitness identification was the only evidence other than accomplice testimony linking the defendant to the crime.

### Analysis

■ Returning to the instant case, we begin by considering whether the trial court erred, as a matter of law, in ruling that the State did not violate Rule 4–263(a). It is undisputed that the State's pretrial discovery as supplemented informed defense counsel that Cooper had positively identified the appellant in a photographic array; that, upon viewing the same array, Bailey had been able to narrow her selection to two photographs, including the appellant's, but was not able to make a positive identification; and that Bailey did not sign the photographic array above the appellant's photograph to signify that she had positively identified him. Detective Valenzia's trial testimony was consistent with the discovery materials disclosed and supplemented by the State, *i.e.,* that Bailey did not make a positive identification. Likewise, Detective Valenzia's notes about the photographic array, which were in the police file that was produced to defense counsel before trial, reflected that Bailey did not make an identification from the photographic array.

Bailey's testimony initially was consistent with the State's disclosure. On direct examination, she said she had narrowed her selection to two photographs—one of the appellant and one of another unknown man. Between these two, she thought the other man was "too heavy," but that the appellant's photograph looked "a little darker" than she had remembered.

Bailey's testimony shifted, however, and eventually she claimed to have indeed made a positive identification during the photographic array presentation. On cross-examination, she responded unequivocally to defense counsel's questioning that she had identified the appellant as the man who robbed her. When the court questioned her, she said it was her "belie[f]" that she had made a positive identification, acknowl-

edging that the appellant's photograph had appeared "too dark," but explaining that his "features looked the same."

On redirect, Bailey again asserted that she "believe[d]" she had made a positive identification. She also answered affirmatively, however, when the prosecutor asked her if she had only narrowed her selection down to two photographs.

We see nothing to suggest that the State intentionally misled the defense; on the contrary, the prosecutor's surprise at Bailey's testimony is evident even from the cold record. Moreover, the prosecutor offered her notes to defense counsel to use during his re-cross examination of Bailey. We similarly find nothing in the record to suggest that Detective Valenzia intentionally misled the State as to the extent of Bailey's certainty regarding her identification.

The appellant argues that the case at bar is not distinguishable from *Williams;* and that the trial court should have ruled that the State violated Rule 4–263(a) by not informing him, in its mandatory discovery, that Cooper *and* Bailey were going to give identification testimony. He maintains that the discovery materials disclosed by the State lacked accuracy, which the Court in *Williams* emphasized is essential, and as a consequence he went into trial unaware of one of the most compelling pieces of evidence against him—Bailey's identification. He points out that his lawyer represented to the jurors in opening statement, in reliance upon the State's inaccurate discovery, that Bailey would not identify him in her testimony; and that the State capitalized upon its inaccurate discovery disclosure by arguing that the two witnesses, Cooper and Bailey, each had been able to positively identify him.

We disagree that the case at bar is controlled by *Williams*. As we see it, the two cases are distinguishable.

In *Williams,* the witness who made the unexpected (from the defendant's standpoint) in-court identification was the trooper who conducted the surveillance of the apartment immediately before the raid. The trooper did not identify the defendant pre-trial by means of a photographic array or a line-up. Rather, his identification was based solely upon what

he observed on the night of the crime, while he was participating in the police operation. Thus, the trooper not only was an eyewitness to the criminal conduct, he "participated in the investigation" of the case and "reported[] to the office of the State's Attorney" regarding the case, within the meaning of Rule 4–263(g). The information that became known to him by virtue of his participation, including his knowledge of the identity of the man who entered the apartment prior to the raid, was imputed to the State's Attorney's Office. Under subsection (g) of the rule, "the State's Attorney was accountable for information held by Trooper Wilson[.]" *Williams, supra,* 364 Md. at 177, 771 A.2d 1082.

In *Williams,* the identification information given to the defendant before trial was inaccurate because it was contrary to the information known before trial to Trooper Wilson, whose knowledge about the case was imputed to the State's Attorney's office. Because Trooper Wilson knew, before trial, that he could identify the defendant as the person who entered the targeted house 30 minutes before the raid, the State's Attorney's Office was deemed to have known that too. Yet, apparently due to inadvertence, the prosecutor assigned to the case thought that, before trial, Trooper Wilson could not identify the defendant as that person.

The thrust of the Court's opinion in *Williams* is that, given that the scope of the State's discovery obligation encompasses those facts known to anyone in the State's Attorney's Office or law enforcement agencies who participated in or reported about the case, the prosecutor assigned to a case must do the legwork necessary to determine the accuracy of the State's discovery information and to disclose information that is accurate. Otherwise, there is an untenable risk that, due to inadvertence or intentional conduct, prejudicial evidence that the defendant is entitled to know, fully and accurately, before trial will not be disclosed. When, before trial, the mandatory discovery information given by the prosecutor does not include identification evidence that the State's Attorney's Office is deemed to know, and is obligated to accurately report, the

conflict of information is internal to the prosecution, and cannot excuse a non-disclosure to the defendant.

The case at bar does not involve an internal conflict of information between the prosecutors and law enforcement officers or investigators working with them, or reporting to them, about the case. Bailey is not a Rule 4–263(g) actor. She did not "participate[] in the investigation or evaluation of the action" and did not "either regularly report, or with reference to the particular action ha[d] reported, to the office of the State's Attorney." Rule 4–263(g). Rather, she was one of the crime victims.

To be sure, the State had an obligation to disclose to the defense the information obtained by Detective Valenzia when he presented the photographic array to Bailey, and to do so accurately, without even inadvertent mistake. If, during the photographic array presentation, Bailey had selected the appellant's photograph, said he was "the man," or indicated a willingness or desire to sign the array as a positive identification of the appellant, those facts would be imputed to the State's Attorney's Office under Rule 4–263(g), and any inconsistency between them and the information disclosed by the State in mandatory discovery would constitute a discovery violation, regardless of how the inaccurate discovery came to be disclosed. In the case at bar, however, there was no inconsistency between the information Detective Valenzia represented he obtained from Bailey during the photographic array presentation and the information disclosed by the prosecutor to the defense in mandatory discovery. Thus, there was no internal inconsistency of information within the State's Attorney's Office.

The inconsistency that arose at trial was between the information Bailey was claiming to have given Detective Valenzia during the array presentation and the information Detective Valenzia was claiming to have received from Bailey during that presentation. This was a credibility issue, not a discovery violation issue, and the trial court's instruction to the jury properly addressed it. The court correctly ruled that, under

the circumstances, the State did not violate its discovery obligation by not informing the defense that Bailey made an actual identification of the appellant from the photographic array.

## II.

■  The appellant next contends that the circuit court committed reversible error when it allowed Detective Valenzia to testify that, prior to being identified by Cooper from the photographic array, the appellant was a "target" of the investigation. According to the appellant, this testimony violated the court's pretrial order by implicitly referring to the anonymous tip received by police.

The State responds that this issue is entirely unpreserved for our review and, even if preserved, is without merit because the detective's testimony did not violate the court's pretrial order.

As discussed, *supra,* the day after the carjacking Detective Valenzia received a telephone call from an unidentified person who advised him to "[l]ook at [the appellant] for that carjacking." He developed the photographic array shown to Cooper and Bailey based on this anonymous tip.

On September 6, 2005, in a pre-trial hearing, defense counsel made a motion *in limine* to exclude any evidence of the anonymous tip on hearsay grounds. The State did not oppose the motion and the court granted it. The court further indicated that it would instruct Detective Valenzia that he could not mention the anonymous tip and suggested that the State's attorney phrase her question concerning the development of the photographic array as follows: "[D]id you have an occasion to put together a photo array[?]"

During the State's direct examination of Detective Valenzia, he was asked how he learned the appellant's address. He responded: "[W]hile I was conducting my investigation and prior to showing the photo arrays, it became aware to me [sic] that several sources that I had used to obtain his identity, he

gave an address of 1155 Kitmore Road." No objection was raised to this testimony.

On cross-examination, defense counsel questioned Detective Valenzia extensively concerning how and why he chose the photographs appearing in the photographic array and why he did not pursue as a suspect the man in the second photograph tentatively identified by Bailey. It was in response to these questions that Detective Valenzia referred to the appellant as a "target" of the investigation and repeatedly testified that he chose photographs for the array based on their resemblance to the appellant, not based on the descriptions provided to the police by Cooper and Bailey. Defense counsel did not interpose any objections during this testimony.

Because all of the challenged testimony came in without objection, this issue is not preserved and we decline to exercise plain error review. *See* Md. Rule 8–131(a) ("[O]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court."); *Abeokuto v. State*, 391 Md. 289, 327, 893 A.2d 1018 (2006) (appellate courts "will review [an] unpreserved claim only where the unobjected to error can be characterized as compelling, extraordinary, exceptional, or fundamental to assure the defendant a fair trial") (citation omitted); *Uzzle v. State*, 152 Md.App. 548, 583–84, 832 A.2d 869 (2003) (issue of whether court erred in admitting testimony concerning a lie detector test unpreserved where defense counsel failed to object or request other relief at trial).[8]

## III.

■ The appellant lastly contends that his trial counsel's deficient performance so prejudiced him that a reversal of his

---

8. We also note that almost all of the challenged testimony was elicited by defense counsel during cross-examination. The appellant cannot now "benefit" on appeal from an error he invited. *See Ruth v. State*, 133 Md.App. 358, 373, 757 A.2d 152 (2000) (quoting *Allen v. State*, 89 Md.App. 25, 43, 597 A.2d 489 (1991)) (explaining that the "invited error" doctrine dictates that defendants should not "obtain a benefit," such as a mistrial or reversal on appeal, from an error they invited or created).

conviction is warranted. He asserts that defense counsel's decision not to impeach Cooper with "two *crimen falsi* convictions" was "objectively unreasonable" and that, because Cooper was the State's "key witness," the prejudice is clear. The State counters that the ineffectiveness issue is a matter for post-conviction relief, not direct appeal, and in any event, is without merit.

The only evidence in the record concerning Cooper's criminal record appears in the police file prepared by Detective Valenzia and provided to defense counsel during pretrial discovery. The following notations appear in the file:

VICTIMS['] RECORD–PAIGE BAILEY NO RECORD

GARY COOPER–11/21/98 FORGERY

04/25/98   UTTER FORGED TICKET

01–1–90   DISORDERLY

The notation does not reveal whether Cooper merely was charged with these crimes or convicted. The notation also does not reveal the underlying facts associated with the charged crimes.

When Cooper was called as a witness at trial, defense counsel did not question him about his criminal record.

■ We agree with the State that this is an issue better suited for review at the post-conviction stage. Ordinarily, we will not reach claims of ineffective assistance of counsel on direct appeal. *Ware v. State,* 360 Md. 650, 706, 759 A.2d 764 (2000); *Perry v. State,* 344 Md. 204, 227, 686 A.2d 274 (1996). This is so because "the trial record rarely reveals why counsel acted or omitted to act, and [post-conviction] proceedings allow for fact-finding and the introduction of testimony and evidence directly related to allegations of the counsel's ineffectiveness." *Mosley v. State,* 378 Md. 548, 560, 836 A.2d 678 (2003) (footnote omitted); *see also Walker v. State,* 338 Md. 253, 262, 658 A.2d 239 (1995) (noting that "[t]he consideration of ineffective assistance claims in a trial setting provides the opportunity to develop a full record concerning relevant factu-

al issues, particularly the basis for the challenged conduct by counsel").

The fact that defense counsel did not question Cooper concerning his criminal record may have been inadvertent or, just as possibly, may have been a function of trial strategy. Cooper was the victim of a car-jacking and armed robbery. Defense counsel reasonably could have believed that members of the jury would disfavor an attempt to discredit him with two seemingly minor nonviolent prior convictions (if indeed they were convictions at all). A post-conviction proceeding, if filed, would give defense counsel the opportunity to testify and explain the reasons behind his decision not to impeach Cooper's credibility. On the state of this record, we simply do not know why defense counsel proceeded as he did. For that reason, the issue is not one properly to be addressed on direct appeal.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**